UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JASON C. SZEFLER, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:18-cv-668-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Jason C. Szefler ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for disability insurance benefits ("DIB") under Title II of the Act and his application for Supplemental Security Income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned, in accordance with a standing order (*see* ECF. No. 18).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 11, 16. Plaintiff also filed a reply. *See* ECF No. 17. For the reasons set forth below, Plaintiff's motion (ECF No. 11) is **DENIED**, and the Commissioner's motion (ECF No. 16) is **GRANTED**.

## BACKGROUND

On July 21, 2010, Plaintiff protectively filed a Title II application for a period of disability and DIB, alleging disability beginning on July 10, 2010 (the disability onset date), due to: severe head injuries, short term memory loss, anxiety, depression, obsessive-compulsive disorder, bipolar disorder, and seizures. Transcript ("Tr.") 116-17, 152, 462. Plaintiff's application was denied initially on January 7, 2011, after which he requested an administrative hearing. Tr. 74-75. A

hearing was held in Buffalo, New York, on April 26, 2012, before Administrative Law Judge, Timothy M. McGuan (the "ALJ"). Plaintiff appeared and testified at the hearing and was represented by Jessica Welker, an attorney. Jay Steinbrenner, an impartial vocational expert ("VE"), also testified at the hearing. ALJ McGuan issued an unfavorable decision on July 25, 2012, finding Plaintiff not disabled. Tr. 8-21. On August 30, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 1-3. Plaintiff subsequently initiated a civil action in the United States District Court for the Western District of New York. *See* Case No. 1:13-cv-01074-MAT-HBS.

On September 30, 2015, District Judge Richard J. Arcara issued an order adopting the Report and Recommendation of Magistrate Judge Hugh B. Scott, recommending the case be remanded back to the Commissioner. *See* Case No. 1:13-cv-01074-MAT-HBS, ECF No. 17; Tr. 731. The case was remanded for the following reasons: (1) reconsideration of the medical evidence with respect to the ALJ's complex work finding; and (2) reconsideration of any hypothetical regarding plaintiff's concentration, persistence, and pace. *See* Case No. 1:13-cv-01074-MAT-HBS, ECF No. 13. Thereafter, ALJ McGuan presided over a new hearing held on December 15, 2017 in Buffalo, New York. Plaintiff was represented by Nicolas Di Virgilio. VE Jay Steinbrenner also appeared and testified at the hearing. Tr. 657-708. ALJ McGuan issued an unfavorable decision on March 8, 2018, finding Plaintiff not disabled. Tr. 459-490. Sixty days later, the ALJ's decision became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g). As explained in his March 13, 2018 decision, the ALJ consolidated Plaintiff's subsequent claims for Title II and Title XVI benefits with the remand of the prior case and issued one decision, which is a concurrent claim or claims for Title II benefits filed on July 21, 2010, as well as a claim for Title XVI benefits filed on April 15, 2015. Tr. 463.

# LEGAL STANDARD

## I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the

"Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his March 13, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014;

2. The claimant has not engaged in substantial gainful activity since July 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.);

3. The claimant has the following severe impairments: major neuro-cognitive disorder based on a traumatic brain injury in 1992, major depressive disorder, bipolar disorder and post-traumatic focal seizures (20 CFR 404.1520(c) and 416.920(c));

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart

4

P, Appendix 1 (20 CFR 404.1520(11), 404.1525, 404.1526, 416.920(11), 416.925 and 416.926);

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can do simple, routine unskilled work; can occasionally interact with the public with no interaction limits with others; cannot be exposed to heights or dangerous machinery; and cannot operate motorized vehicles;

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7. The claimant was born on October 5, 1972 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963);

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a));

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 10, 2010, through the date of this decision (20 CF'R 404.1520(g) and 416.920(g)).

Tr. 466-82.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on July 21, 2010, Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act. *Id*. at 482. The ALJ also determined that based on the application for supplemental security income protectively filed on April 15, 2015, Plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act. *Id*.

## ANALYSIS

Plaintiff alleges two points of error. Plaintiff argues that medical opinions rendered in 2010 and 2011 warranted re-evaluation due to Plaintiff's head injury in September 2011, and, relatedly,

Plaintiff contends the ALJ improperly "cherry-picked" the medical evidence to support his desired result. Plaintiff also argues the ALJ erred by giving significant weight to Plaintiff's GAF scores.[1] *See* ECF No. 11-1 at 1, 17-21, 23. The Commissioner argues in response that substantial evidence supports the ALJ's RFC, and with that RFC, and considering Plaintiff's vocational factors, he could make a successful adjustment to perform other work existing in significant numbers in the national economy. *See* ECF No. 16-1 at 19.

**I.     The ALJ Properly Considered the Medical Opinion Evidence.**

Plaintiff objects to the ALJ's assignment of great weight to medical opinions rendered in 2010 and 2011, arguing these opinions were "stale" in light of Plaintiff's head trauma in September 2011. *See* ECF No. 11-1 at 17-21. Plaintiff further argues that this head trauma required the ALJ to obtain an additional medical opinion about Plaintiff's mental functioning. *Id*. at 19-21.

An ALJ will consider all medical opinions in conjunction with any other relevant evidence received in order to determine a claimant's RFC. *See* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); 404.1527(c), 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). In this case, the record contained opinions from treating, examining, and non-examining sources—all "acceptable" medical sources who can issue "medical opinions" as defined by the regulations. 20 C.F.R. §§ 404.1502(a)(1)-(5), 416.902(a)(1)-(5) (defining acceptable medical sources); 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (defining medical opinions). The record also contained opinions

---

[1] A GAF score is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Rev. 2000) (DSM-IV-TR). A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR at 34.

from "other" sources, which the ALJ also considered. 20 C.F.R. §§ 404.1527(f) and 416.927(f) (discussing the consideration of opinions from "other sources").

Plaintiff takes issue with the ALJ's consideration of the opinions of Nikita Dave, M.D. ("Dr. Dave"), Michael Santa Maria, Ph. D. ("Dr. Santa Maria"), and M. Totin ("Dr. Totin"), a State agency psychological consultant. *See* ECF No. 11-1 at 19-20. The ALJ gave great weight to each of these opinions. The Commissioner responds that the ALJ properly evaluated the medical opinions from 2010 and 2011 and was warranted in affording them great weight. *See* ECF No. 16-1 at 19. The Court agrees.

The ALJ gave great weight to Dr. Santa Maria's opinion that Plaintiff needed to avoid jobs that required more planning, problem solving, and memory. Tr. 478. In July 20, 2010, Dr. Santa Maria, a board-certified neuropsychologist, performed a cognitive and psychological evaluation. Tr. 228-34. Plaintiff described his past traumatic brain injury and his work history. Tr. 228. He reported no history of seizures, though he was taking anticonvulsant medication. *Id*. His symptoms included memory problems, misplacing things, acting impulsively, spending money frivolously, a desire for control, and a low frustration tolerance. *Id*. He also had some obsessive-compulsive disorder complaints. Tr. 228-29. Plaintiff stated he lost his job and had been demoted three to four times before being let go. Tr. 229. He also reported his mood had declined following his job loss Tr. 230. Plaintiff reported he was independent in his activities of daily living, including "bathing, dressing, cooking, laundry, housekeeping, grocery shopping and driving," though he admitted he "sometimes forgets to take his medications." Tr. 230.

Upon examination and testing, Plaintiff recalled 0 of 3 words after a brief delay although he accurately completed 3 steps in a 3-step command presented to him. Tr. 230. He had good eye contact and his speech was fluent and clear; he had goal-oriented speech; and he did not have evidence of paraphasic errors, word finding difficulties, or perseveration. *Id*. He was also able to

7

understand and was able to apply information. *Id*. Dr. Santa Maria concluded the test results were considered reliable and valid, as "[Plaintiff] appeared to work to the best of his abilities throughout the course of the examination" *Id*. He determined that Plaintiff exhibited a major neuro-cognitive disorder due to his traumatic brain injury, a moderate major depressive disorder, and an alcohol abuse condition. Tr. 233. Dr. Santa Maria stated Plaintiff demonstrated deficits involving memory, complex problem solving, and spatial perceptual abilities. Tr. 233-34. Plaintiff had mildly deficient ability to learn and recall spatial information immediately despite normal delayed recognition memory. Tr. 233. Plaintiff's increased obsessive traits were consistent with the nature of his traumatic brain injury. Tr. 234. Importantly, although Dr. Santa Maria determined that Plaintiff could not do his past work, he could do less demanding work where planning, problem solving, and memory were more limited. *Id*.

The ALJ found that Dr. Santa Maria's opinion was based on a "very thorough and in depth evaluation," and he credited the doctor's specialty as a board-certified neurologist. Tr. 478. Although Plaintiff argues that the ALJ "cherry-picked" the portions of Dr. Santa Maria's assessment that supported his desired result (*see* ECF No. 11-1 at 21-23), the ALJ acknowledged that Dr. Santa Maria noted inconsistent findings on examination, but nevertheless indicated that Plaintiff could engage in work activities as limited. Tr. 478. The ALJ also discussed that Plaintiff's report to Dr. Santa Maria regarding his wide range of daily activities was consistent with his assessed restrictions. *Id*. These were proper factors for the ALJ to consider in affording great weight to the opinion. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); §§ 404.1527(c)(3), 416.927(c)(3) (opinions supported by relevant evidence and a better explanation will be given more weight); §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that

8

opinion."); §§ 404.1527(c)(5), 416.927(c)(5) (the opinion of a specialist about the issues related to the specialty is generally given more weight than to the opinion of a non-specialist). Based on the foregoing, the Court finds that the ALJ properly evaluated Dr. Santa Maria's opinion in light of the record as a whole and appropriately afforded it great weight to the extent it was consistent with the other substantial evidence of record.

As with his analysis of Dr. Santa Maria, the ALJ's assignment of great weight to Dr. Dave's opinion that Plaintiff should not climb ladders, work with heights, or work with heavy, dangerous equipment and machinery due to seizures, anxiety, and head injury (Tr. 479) and Dr. Totin's opinion that Plaintiff could do simple work if not abusing alcohol (Tr. 479) was consistent with substantial evidence in the record. The ALJ discussed that Dr. Dave was an impartial neurological consultative examiner who was well-acquainted with the Social Security disability process. Tr. 479. He also noted that Dr. Dave completed a thorough examination of Plaintiff and his assessment was consistent with her findings, including the fact that Plaintiff had an essentially normal examination. *Id*. Similarly, the ALJ discussed that Dr. Totin was an impartial reviewing state agency mental health consultant, who had a thorough understanding of the Social Security disability process. *Id*. He also noted that Dr. Totin's assessment was supported by appropriate findings and found his opinion regarding Plaintiff's limitations was consistent with other evidence of record. *Id*. Thus, in both cases, the ALJ considered and discussed appropriate regulatory factors in assigning great weight to these opinions. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (examining relationship); §§ 404.1527(c)(3), 416.927(c)(3) (supportability); §§ 404.1527(c)(4), 416.927(c)(4) (consistency); §§ 404.1527(c)(6), 416.927(c)(6) (the source's understanding of agency disability programs and their evidentiary requirements and the extent to which the source is familiar with the case record are additional factors considered in weighing the opinion). Contrary to Plaintiff's argument, the ALJ could appropriately afford great weight to these opinions.

Plaintiff also argues that the ALJ was required to obtain additional medical opinions because the 2010 and 2011 opinions were no longer valid following Plaintiff's head injury in September 2011. *See* ECF No. 11-1 at 19-20. That argument also fails. An abundance of evidence in the record supports the ALJ's RFC assessment, and the ALJ extensively discussed the evidence after Plaintiff's September 2011 head injury and explained why such evidence was inconsistent with Plaintiff's claim of disability. Tr. 466-80.

The record indicates that on September 16, 2011, Plaintiff fell and hit his head on ceramic tile. Tr. 380. On examination, George Kalonaros, M.D. ("Dr. Kalonaros"),[2] documented that Plaintiff was oriented, with clear speech, intact mental status, and intact neurological function. Tr. 380. A CT scan showed no abnormality. Tr. 381. A few days later, Plaintiff told his treating mental health provider, psychiatrist Maria Nickolova, M.D. ("Dr. Nickolova") that he had moderate anhedonia, anxiety, poor concentration, decreased energy level, hopelessness, decreased energy level, increased isolative behavior, poor memory, decreased motivation, increased sadness and trouble sleeping. Tr. 359. On examination, Dr. Nickolova reported that Plaintiff had slowed motor activity and depressed mood, but he was cooperative with fair eye contact, and he had coherent thought processes, no delusions, no hallucinations, no obsessions, no pre-occupations, and no somatic thoughts. *Id*. He had impaired memory; fair attention and concentration; coherent thought processes and intact judgment and insight; and no suicidal or homicidal ideations. *Id*. Dr. Nickolova assessed a GAF rating 58 to 59 and diagnosed recurrent major depressive disorder, rule out bipolar disorder. Tr. 359. Plaintiff was counseled on the need to remain compliant with care and use of his medications for his mental health. Tr. 359-60.

---

[2] The record reflects that Dr. Kalonaros a neurologist, had previously treated Plaintiff from April 2010 to September 201. Tr. 206-08, 301, 365-66, 380-81.

In a visit to his primary care physician, John Fabian, M.D. ("Dr. Fabian) on October 20, 2011, Plaintiff reported he was experiencing constant headaches for the last five days with photophobia and vertigo. Tr. 399. From October 21, 2011 through October 25, 2011 Plaintiff was admitted at Kenmore Mercy Hospital as a result of his fall in September 2011. Tr. 1049. A CT scan showed intracranial hemorrhage and he was admitted to the intensive care unit for observation. *Id*. Treatment notes reflect he had positive symptoms for headache, and negative for altered mental status, hearing loss, seizure activity, speech changes, tingling, tremor, visual changes, or weakness. Tr 1056. His Glascow Coma Scale ("GCS")[3] score was 15. *Id*. His hemorrhages remained stable and by the time of discharge there was no significant head pain. Other than a headache, he was neurologically stable at the time of discharge. *Id*. He was told to avoid any activity which involved a risk of fall. *Id*.

In an evaluation with neurologist, John Farhbach, IV, M.D. ("Dr. Farhbach") on November 11, 2011, Plaintiff reported persistent severe, constant bifrontal headaches, difficulty with memory, dizziness, and loss of balance. Tr. 392. He was diagnosed with a closed head injury and fairly severe post-concussive syndrome. *Id*. Plaintiff was seen at Forever Recovered from November 23, 2011 through January 20, 2012, when he graduated from the program. Tr. 427-453. From January 25, 2012 through April 3, 2012, Plaintiff was seen four times at Alden Counseling and Wellness. Tr. 457-458. Plaintiff's mood was noted to be continuously depressed. Tr. 458.

Plaintiff reported to the emergency room at Kenmore Mercy Hospital on July 7, 2012 complaining of what he described as a moderate headache. Tr. 1045. Again, there were no neurological deficits, a negative stroke scale, and a GCS of 15. Tr. 1046-47. In May 2013, Plaintiff was admitted to Kenmore Mercy Hospital due to a seizure. Tr. 1035. A CT scan of the head

---

[3] The Glasgow Coma Scale provides a practical method for assessment of impairment of conscious level in response to defined stimuli. The GCS is scored between 3 and 15, with 3 being the worst, and 15 the best. *See* https://www.glasgowcomascale.org.

revealed a zone of encephalomalacia in the right frontal lobe and previous craniotomy on the left, both stable in appearance. Tr 1035. There was no evidence of acute process or intracranial hemorrhage. *Id*. He was told to resume taking Depakote and Lamictal and to consult with Dr. Kalonaros. Tr. 1026. In the meantime, he was advised not to drive or operate machinery. *Id*. As with other admissions, no significant neurological deficits were noted. Tr. 1039.

In December 2014, Plaintiff had a normal EEG. Tr. 888. Also in December 2014, Plaintiff's psychiatrist, Brian Joseph, M.D. ("Dr. Joseph"), prepared a "Mental Health Report" for the Niagara County Department of Social Services, wherein he stated that from a mental health perspective, Plaintiff was able to work part-time. Tr. 1429. Dr. Joseph noted that Plaintiff struggled with his mood, got irritable, isolated, and had anger issues. *Id*. He assessed that Plaintiff had a GAF rating of 55. *Id*.

A depression screening in May 2015 revealed that Plaintiff had symptoms of moderately severe depression. Tr. 992. The next month, his depression was noted to be stable. Tr. 980. Also in June 2015, a progress note from Niagara Falls Memorial Medical Center indicated Plaintiff was alert and his cranial nerves were intact or unremarkable. Tr. 1023. He was sleeping well and had not had a recurrence of a seizure. *Id*. In September 2015, Plaintiff reported he was currently in school. Tr. 956. He had normal mood and cognition. *Id*. In November 2015, Plaintiff told Simmanjeet Mangat, M.D. ("Dr. Mangat"), his primary care physician at Niagara Falls Primary Care Center, that he felt well; he denied any new complaints; and his examination was unremarkable. Tr. 947-48. In an April 2016 visit, Plaintiff was noted to have moderate depression on screening, but otherwise, there was nothing abnormal noted on the psychiatric examination. Tr. 938-39. The note indicates Plaintiff was "stable" and his depression was followed by a psychiatrist. Tr. 939. He was directed to continue with medications. *Id*. In July 2016, it was noted that Plaintiff had a record of multiple "no shows" on scheduled appointments, and he was advised that future

missed appointments would lead to termination from the practice. Tr. 933. Thereafter, Plaintiff missed his October 2016 appointment due to being incarcerated. Tr. 925.

A "Mental Health Report" prepared by Niagara County Mental Health for the Niagara County Department of Social Services in August 2016 stated that from a mental health perspective, Plaintiff was able to work part-time and noted Plaintiff's functional limitations were related to his traumatic brain injury. Tr. 1428. He was assessed a GAF rating of 55. *Id*. Records from Niagara County Mental Health indicated that Plaintiff was discharged from treatment in November 2016 due to noncompliance with treatment and appointment attendance. Tr. 1009. The note also reported that Plaintiff had experienced some improvement during his two years of treatment. *Id*. In August 2017, another "Mental Health Report" was prepared by Niagara County Mental Health for the Niagara County Department of Social Services. Tr. 1427. This time, it was noted that from a mental health perspective, Plaintiff was unable to work and that these restrictions were expected to last more than 12 months. Tr. 1427. He was assessed a GAF rating of 52. *Id*. The report indicates that Plaintiff was last seen in July 2017, when he was discharged because of non-compliance. *Id*.

In September 2016, Plaintiff went to the emergency room with complaints of depression. Tr. 881. The note indicates Plaintiff was inebriated on arrival and made suicidal statements after he found out his girlfriend had a new boyfriend. *Id*. In April and May 2017, Plaintiff was noted to have a poor attention span, and he stated that he continued to drink and had poor impulse control. Tr. 1333, 1699. In July 2017, Plaintiff went to the emergency room after being assaulted and hit on the head with a metal item. Tr. 1912. He denied loss of consciousness but complained of a headache. *Id*. On examination, Plaintiff had normal musculoskeletal, neurological, and psychiatric examinations. Tr. 1913-14. A head CT scan showed he had no intra-cranial pathology. Tr. 1914. The doctor assessed a minor head injury. Tr. 1912.

In September 2017, neurologist Gregory Sambuchi, M.D. ("Dr. Sambuchi") noted that Plaintiff would require seizure medication for life. Tr. 1934. After noting that Plaintiff had "failed Depakote, lamotrigine, and topiramate in the past," Dr. Sambuchi prescribed a medication with "little if any negative psychiatric side effects and [that] typically does not affect memory." *Id*. He concluded that Plaintiff should "continue with normal activities," using expected safety rules such as swimming with supervision, avoiding heights and dangerous machinery. *Id*. He noted that Plaintiff had a history of two generalized convulsive seizures, one in May 2013 and the other in June 2015, but that Plaintiff had not been on any anti-seizure medications at those times. Tr. 1930. His simple focal seizures lasted one to two minutes without loss of consciousness and resulted in tingling in his head and bilateral upper extremities. Tr. 1935. In November 2017, Plaintiff reported no seizures of recent history and no medication side effects. Tr. 1932. He appeared to have short-term memory loss. Tr. 1930. He had intact ability for immediate recall but spelled the word "world" incorrectly. Tr. 1932. He could remember 3 of 3 words with prodding; he was able to understand and apply information; he had normal speech and language and was alert and fully oriented; and he had grossly intact short- and long-term memory. *Id*.

The ALJ thoroughly reviewed the evidence of record, including the evidence after Plaintiff suffered his head injury in September 2011. The ALJ discussed that within a month after Plaintiff's injury, a November 2011 CT scan showed significant improvement in the appearance of the hematoma and no new hemorrhage. Tr. 474 (citing Tr. 390). He noted that neurosurgeon Dr. Fahrbach documented that Plaintiff had improvement in his basal frontal hematoma after his October 2011 fall and would not require surgical decompression. Tr. 468 (citing Tr. 861-62). Plaintiff was observed to be alert and fully oriented, and he exhibited fluent speech and normal stance. Tr. 468 (citing Tr. 861). The ALJ also discussed that Plaintiff worked from 2012 to 2014, including working at levels of substantial gainful activity in 2013. Tr. 466, 468-69, 471, 660. He

14

noted that Plaintiff stopped working in 2014 due to incarceration. Tr. 1088. He also considered that Plaintiff subsequently reported both working and going to school to obtain his GED during his mental health treatment from October 2014 to November 2016. Tr. 478 (citing Tr. 1009, 1089). The ALJ also discussed Plaintiff's normal examination findings, including that from October 2014 to October 2016, neither Plaintiff's counselor/social worker nor the psychiatrist noted any problems with Plaintiff's memory, attention or concentration of a significant degree and they asserted he could maintain focus and attention. Tr. 478. The ALJ also noted that Plaintiff's GAF ratings were consistent with only moderate symptoms, which were accounted for by the limitations included in the RFC. Tr. 475, 478-80. He also discussed the fact that Plaintiff's counselor and his psychiatrist opined that Plaintiff could work at least part time. Tr. 478-79 (citing 1428-29). The ALJ accordingly found that this evidence was inconsistent with Plaintiff's claims of disability. Tr. 471, 477-78

Based on the foregoing, the Court finds that the evidence discussed by the ALJ supports his RFC assessment and is consistent with the opinions from Dr. Santa Maria, Dr. Dave, and Dr. Totin. Contrary to Plaintiff's allegation, the evidence after his September 2011 head injury does not show the deterioration alleged by Plaintiff, and the opinions from 2010 and 2011 were not stale. The ALJ appropriately evaluated the medical opinions through the lens of the evidence available to the examiners at the time, as well as in the context of the evidence offered since the opinions were authored, and formulated the RFC based on his consideration of the record as a whole. *See Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (rejecting claimant's contention that State agency psychological consultant's opinion was "stale" because it did not have the benefit of later-submitted treatment records and treating physician evidence).

Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record *could*

support his position. Plaintiff must show that no reasonable fact finder could have reached the ALJ's conclusions based on the evidence in record. *See Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 448 (2d Cir. 2012); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (reviewing courts must afford the Commissioner's determination considerable deference and cannot substitute its own judgment even if it might have reached a different conclusion).

## II. The ALJ Properly Considered Plaintiff's GAF Scores.

Plaintiff argues that it was "clearly erroneous" for the ALJ to give "significant weight" to his GAF ratings because GAF ratings have been removed from the DSM-5. *See* ECF No. 11-1 at 23. However, although GAF ratings have been removed from the DSM-5, the agency continues to receive and consider GAF ratings when evaluating the medical evidence and has provided guidance to ALJs on how to evaluate GAF ratings. *See* SSA's Admin Message 13066, Global Assessment of Function (GAF) Evidence in Disability Adjudication, issued July 22, 2013, revised October 14, 2014, and June 28, 2017 ("AM-13066 REV 2"). For claims filed prior to March 27, 2017, the agency considers GAF ratings to be opinion evidence and ALJs are to evaluate the ratings as provided in the applicable regulations. *Id.*; *see also Seignious v. Colvin*, No. 6:15-CV-06065(MAT), 2016 WL 96219, at *6 (W.D.N.Y. Jan. 8, 2016) ("GAF scores are relevant, but they generally cannot be used to contradict a medical source's opinion that the claimant is disabled because GAF scores do not have a direct correlation to the severity requirements in [the Commissioner's] disorders listings.") (internal citations and quotation marks omitted).

In this case, the ALJ did not rely on the GAF ratings alone to determine Plaintiff's RFC assessment, but instead properly considered them in connection with the record as a whole. The ALJ reasonably found that the ratings were consistent with the other evidence of record, which reflected moderate limitations in functioning that were properly accounted for by the restrictions included in the RFC assessment. *See* 20 C.F.R. § 416.945(a)(3) (noting that the ALJ assesses RFC

"based on all of the relevant medical and other evidence"). GAF ratings of 55, similar to Plaintiff's ratings assessed in this case, have been reasonably found to be inconsistent with a claim of disabling limitations. *Camille v. Colvin*, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016). Accordingly, the Court finds that the ALJ did not err by considering and affording weight to Plaintiff's GAF scores.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 11) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 16) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

*/s/ Don D. Bush*
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE